

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-76,580

---

### ALBERT JAMES TURNER, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL FROM CAUSE NO. 10-DCR-054233
### IN THE 268TH DISTRICT COURT
### FORT BEND COUNTY

---

**KELLER, P.J., filed a dissenting opinion in which MEYERS, KEASLER and HERVEY, JJ., joined.**

Appellant, who has no history of mental illness, understands what he is accused of and the nature of the proceedings, and he understands who his attorneys are and that they are tasked with representing him. His refusal to cooperate with his attorneys does not, in my view, make him incompetent to stand trial. The Court maintains, however, that there is some evidence that appellant is incompetent to stand trial as a result of paranoid delusions about his attorneys' motives and other

aspects of the case.  I disagree.

Under our statute a person is incompetent to stand trial if he does not have:

(1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or

(2) a rational as well as factual understanding of the proceedings against the person.[1]

No one disputes appellant's competence under part (2); that is, no one suggests that he lacks a rational as well as factual understanding of the proceedings against him.  The issue before us is his competence under part (1), whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.

The trial court had before it three types of evidence relevant to this determination: (1) expert evaluations, (2) statements by appellant's attorneys, and (3) appellant's own statements.  None of this evidence shows that appellant lacked the sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding.

### A. The Experts

Appellant was first evaluated by Dr. Karen Gollaher in May of 2010.  He largely cooperated with the competency evaluation but would not discuss his actual actions at the time of the crime in order to protect his Fifth Amendment rights.  Although appellant reported some possible paranoid thoughts, Dr. Gollaher concluded that "these do not undermine his ability to participate in the court procedures."  With respect to competence to stand trial, Dr. Gollaher found:

Mr. Turner knows the charge against him and a possible punishment.  He understands the role of various courtroom person[ne]l, the available pleas and the plea bargaining process . . . . [H]e was concerned that his version of events was heard by the public and he discussed issues that might be considered mitigating.  This

---

[1] TEX. CODE CRIM. PROC. art. 46B.003(a).

suggests that he does have an interest in defending himself and may not be as indifferent as he presents himself to be. He is capable of communicating events in an understandable manner and can report his state of mind.

Dr. Gollaher ultimately concluded that, within a reasonable degree of certainty, appellant was currently competent to stand trial.

In June of 2010, appellant was evaluated by Dr. David Axelrad. Dr. Axelrad said that appellant "may have a mental illness and the diagnosis may be a paranoid disorder" but that appellant was unwilling to disclose the nature of the relationship with his wife immediately preceding the commission of the murders. Though appellant might benefit from psychiatric medications (which he was refusing to take), Dr. Axelrad nevertheless concluded that appellant "is presently mentally competent to stand trial."

In April of 2011, appellant was referred by his attorneys to Dr. Shawanda Williams-Anderson. She concluded, "Because of the seriousness of Mr. Turner's charges, his unwillingness to participate in his defense, and his extreme distrust of every member of his team his competency to stand trial is questionable." She further stated that appellant is "making dire decisions that are detrimental to his defense and has understanding of doing so. Thus his mental capacity to stand trial is not the source of contention, but his ability to participate in the legal process was closely evaluated." She concluded that, "To date, his participation and involvement have had adversarial effects and hindered the defense team in every way. Therefore, Mr. Turner cannot be expected to comply with his team during the progression of his defense including trial. Under Article 46B, Mr. Turner's actions would deem him incompetent to stand trial."

Essentially, Dr. Williams-Anderson conceded that appellant had the mental capacity to stand trial but concluded that appellant distrusted the defense team and was acting in a way detrimental

to his defense. But Dr. Williams-Anderson's focus on appellant's motives and actions is beside the point. Appellant had the mental capacity to work with the members of his defense team but chose not to work with them because he distrusted them. Dr. Williams-Anderson's conclusion that appellant's "actions would deem him incompetent to stand trial" is faulty because a person's actions can never render him incompetent to stand trial. It is the person's mental ability that matters.

Finally, at the urging of defense counsel, the trial court appointed Dr. M. Connie Almeida to evaluate appellant in May of 2011. Dr. Almeida said that she could not reach a professional opinion regarding appellant's competency to stand trial based on her interview "because of his limited cooperation." However, based on her review of records, interview with jail staff, and her limited interview with appellant, it was her professional opinion that appellant's "functioning has not changed significantly since his previous assessments of competency" by Dr. Gollaher and Dr. Axelrad. "It is my opinion," she stated "that there have been no significant changes in Mr. Turner's emotional or cognitive functioning since the time of these evaluations (6/1/10 and 6/18/10) that would adversely impact his competency to stand trial at the present time." When questioned at a hearing, Dr. Almeida stated that she could not definitively say that he was not paranoid and that such condition was not interfering with his ability to rationally assist his defense. But she also affirmed, "There is no current evidence to substantiate a delusional or other psychiatric disorder."

### B. The Attorneys

Attorneys Tyrone Moncriffe and Patrick McCann executed affidavits, but these affidavits were not directly introduced into evidence before the trial court. Some of the content of these affidavits was introduced through Dr. Almeida's testimony. Dr. Almeida summarized these affidavits as expressing the concern that appellant was accusing counsel of coercion, hiding and

misusing information, and not representing appellant's best interests. Counsel elicited testimony from Dr. Almeida that appellant actually believed that the defense attorneys were coercing appellant's children into testifying against him and that McCann was part of a secret society that desired appellant's conviction. Dr. Almeida also recalled that Moncriffe had "indicated several instances of delusional comments and thinking." It was partly based upon these affidavits that Dr. Almeida said that she could not definitively say that appellant did not have a paranoid condition that was interfering with his ability to assist his defense. But even considering those affidavits, Dr. Almeida nevertheless testified that appellant's condition had not changed from the prior interviews and that there was no current evidence to substantiate a delusional or other psychiatric disorder.

At the conclusion of the hearing, McCann argued that appellant's paranoia had impaired the defense because appellant was refusing to discuss any of the jurors with counsel during voir dire. McCann conceded that "examinations in the year prior," by Dr. Gollaher and Dr. Axelrad, "although they showed some of the problem, did not at that time rise to the level, in their opinion of incompetency." But McCann said, "I can tell you that it has materially changed over the last several months, perhaps only because of the proximity of the actual case that's brought this out, but it has—it has brought us to a complete standstill in our ability to determine or advise Mr. Turner about whether to testify or whether to assist in any of this." At that point, the prosecutor interjected, "I don't—I don't mind him arguing, but I've got to be able—to be able to cross-examine somebody if he's going to give you new evidence, Judge." McCann responded, "He's right. He's right, and I'll rephrase that. The Court has watched Mr. Moncriffe and myself struggle with what appeared at first to us to be a recalcitrant client and it has—has clearly, to us, gotten beyond that."

McCann remarked that, "I've never been in a place where the client has withdrawn to this

degree." McCann stated that he believed there had been a change, though perhaps not witnessed by the jail, but a noticeable change in appellant's demeanor and behavior over the last several months. McCann urged the trial court "to give us a chance to sit there and flesh this out during a competency trial, and even if necessary, to appoint Mr. Turner other counsel and allow Mr. Moncriffe and I to testify and subject us to cross."

I believe an attorney's statements about his client's mental state can, in appropriate circumstances, raise an issue of incompetency without regard to expert testimony. But sometimes an attorney's observations, especially with respect to delusions, are not alone a sufficient basis for concluding that a defendant is incompetent.[2] Regardless, in the present case, the defense attorneys specifically refrained from relying upon their own recollections as evidence. Their affidavits were not introduced into evidence and were addressed only as part of the basis for Dr. Almeida's opinions. But as explained above, Dr. Almeida ultimately concluded, despite these affidavits, that there was no current evidence to substantiate a delusional or other psychiatric disorder. And in making statements to the trial court, McCann refrained from framing those statements as testimony, which would have subjected him to cross-examination. Instead, he invited the trial court to rely upon its own observations.

Pointedly, the trial court articulated its own observations, concluding that there was no evidence of incompetency, as follows:

> I have watched Mr. Turner throughout these several weeks that we've been going through the jury selection. He has been paying attention; he has been reacting. Your comment this afternoon about suspicion had a definite reaction from Mr. Turner, so

---

[2] *See Panetti v. Quarterman*, 551 U.S. 930, 962 (2007) ("Expert evidence may clarify the extent to which severe delusions may render a subject's perception of reality so distorted that he should be deemed incompetent.").

he's paying attention.  He knows what's going on.  The fact that he will not talk to you, while that makes defense counsel's representation difficult, it doesn't rise to the level of incompetency.  The evidence just doesn't show that.  And the case cited by the prosecution in this case recognizes that behavior alone doesn't meet the requirements.  It's one part of a whole matter that has to be looked at.  I wanted to hear evidence that would lead us to a full hearing, but I have not heard that; therefore, I'm denying it.

Even if the attorneys' observations were taken as evidence, those observations do not indicate that appellant was incapable of consulting with his attorneys with a reasonable degree of rational understanding.  They show merely that he was *unwilling* to do so.  No one disputes that appellant understood what the proceedings were about and that he was mentally able to consult with the attorneys if he so desired.  That he lacked the desire to do so is not evidence of incompetence.  And to the extent appellant's lack of cooperation escalated, this was based on the fact that the attorneys progressively engaged in tactics with which appellant disagreed, e.g. deposing appellant's children, and by the fact that the trial date loomed ever closer, both of which are at least somewhat rational explanations for appellant's uncooperative behavior.

### C. Appellant's Testimony

Appellant testified at trial that he did not commit the murders and that he was not even present at the time.  He also testified that his wife had been having an affair with the mayor and that the mayor had been threatening him.  He claimed that his children were coerced into making statements against him.  He disagreed with his attorneys' decision to allow his children to participate in depositions, and he disagreed with his attorneys' strategy to admit in opening statement that he killed his wife.  Appellant also made statements that indicated he believed the defense attorney and the prosecutor were suppressing evidence and conspiring to convict him.

On redirect, McCann asked appellant, "Mr. Turner, in your mind, all that drivel was true,

wasn't it?" Appellant responded, "It is true."

On cross, the prosecutor asked, "Do you understand your attorney just said that you're lying, that it's drivel?" Appellant responded, "He's been saying this and trying to pretend. He went out and got a—tried to get a doctor to rule me incompetent. And the reason that he was trying to do that . . . another defense attorney here tried to get legal guardianship of me so they could file stuff on my behalf instead of getting my family members."

Appellant would not be the first guilty defendant to refuse to cooperate with his attorneys. Despite overwhelming evidence showing that he intentionally killed two people, appellant wanted an acquittal. He concocted a far-fetched story to attempt to show his innocence. It might not be an exaggeration to say that his position was extremely shortsighted and wrongheaded, but that does not make him incompetent. His attorneys refused to go along with appellant's desired strategy. While I don't fault them for that, it is understandable that appellant would. The attorney-client relationship had deteriorated to the point that his own attorney was calling his testimony "drivel." It is not difficult to see why appellant is upset with them. Appellant has been an extraordinarily difficult client who seems to have made bad choices about trial strategy. But bad choices are not the same as irrational choices, except in the loosest, non-legal sense. To the extent that the Court conflates the two, I believe that it errs.

The trial court was within its discretion to find, after the testimony of three expert witnesses, that appellant had not established a right to a full hearing.

I respectfully dissent.

Filed: October 30, 2013
Publish